# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * *
| | |
|---|---|
| THOMAS HOHENSTEIN, | * |
| | *    No. 19-1222V |
|                Petitioner, | * |
| | *    Special Master Christian J. Moran |
| v. | * |
| | *    Filed: October 21, 2022 |
| SECRETARY OF HEALTH | * |
| AND HUMAN SERVICES, | *    Finding of Fact, Onset |
| | * |
|                Respondent. | * |

* * * * * * * * * * * * * * * * * * * *

Mark Sadaka, Law Offices of Mark Sadaka Associates, LLC, Englewood, NJ, for petitioner;
Tyler King, United States Dep't of Justice, Washington, DC, for respondent.

## UNPUBLISHED FINDING OF FACT[1]

     Mr. Hohenstein alleges that an influenza ("flu") vaccine caused him to suffer chronic inflammatory demyelinating polyneuropathy ("CIDP"). Am. Pet., filed Mar. 10, 2022. CIDP is a peripheral neurologic disease, sometimes marked by numbness and tingling. Merritt's Neurology, ch. 87, § XII (13th ed., 2015). The parties dispute when Mr. Hohenstein began having numbness and tingling. After the parties developed evidence, a hearing was held on October 11, 2022. The evidence preponderates in favor of an onset of May 15, 2017.

---

[1] The E-Government Act, 44 § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this ruling on its website (https://www.uscfc.uscourts.gov/aggregator/sources/7). Once posted, anyone can access this ruling via the internet. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will be reflected in the document posted on the website.

**Summary of Documentary and Testimonial Evidence**

In 2016, Mr. Hohenstein lived with his wife and children in a two-story log cabin in Strasburg, Pennsylvania. He drove more than one hour each way to work as a commercial plumber for Schaible's Plumbing, Heating and Air Conditioning. In fall 2016, Mr. Hohenstein's assignment was as a secondary foreman at the Blue Angel site. The primary foreman was Eric Colon, and the senior project manager was Tim Olson.

Mr. Hohenstein had an annual physical with his usual primary care doctor, Dr. Tsay, on November 3, 2016. Exhibit 4 at 12-19. As part of the physical, Dr. Tsay reviewed and examined Mr. Hohenstein's musculoskeletal and neurologic systems. The results were normal. Id. at 12-13, 16. Mr. Hohenstein received the flu vaccine on this date. Id. at 17.

Via an affidavit, Mr. Hohenstein asserted he experienced flu-like symptoms about one week after the vaccination. Exhibit 22 ¶ 6. No medical records reflect this illness and in his oral testimony, Mr. Hohenstein could not recall many, if any, details.

One of Mr. Hohenstein's hobbies was hunting for deer. Exhibit 7 (damages affidavit) ¶ 2. In Pennsylvania, the deer season begins the Monday after Thanksgiving. However, according to Mr. Hohenstein's and his wife's testimony, he did not hunt in 2016 because he was not comfortable climbing. In this respect, Mr. Hohenstein is indicating that the numbness in his feet began early enough that the numbness interfered with a favorite activity four days after Thanksgiving.

In another way, Mr. Hohenstein placed the onset of numbness and tingling slightly later, in early December 2016. See Am. Pet. ¶ 3; Exhibit 22 (affidavit, signed Apr. 8, 2022) ¶ 8. Throughout December, Mr. Hohenstein continued to work at his job as a plumber for at least 40 hours per week and sometimes for more than 40 hours per week. Exhibit 14 at 4. Mr. Hohenstein, Mr. Colon, and Mr. Olson testified that Mr. Hohenstein worked very hard and was committed to getting his job done.

Mr. Colon and Mr. Olson averred that they noticed Mr. Hohenstein having trouble performing his job in December. Exhibit 11 ¶ 5; Exhibit 13 ¶ 5. When Mr. Colon was asked to explain how he recalled the onset being around Christmas, Mr. Colon said that he associated Mr. Hohenstein's problems with cold weather. Mr. Colon and Mr. Hohenstein testified that Mr. Hohenstein believed his work boots were contributing to his feeling numb in the cold. On the other hand, when Mr.

2

Olson was asked why he placed the onset at the end of December or beginning of January, Mr. Olson testified he did not know why he said that date. Thus, Mr. Olson's account of the onset of Mr. Hohenstein's difficulties on the job merits little weight.

Other information about the onset of numbness and tingling first appears in a medical record Dr. Tsay created on June 29, 2017. Exhibit 4 at 6-12. Under CC/HPI, Dr. Tsay wrote: "presents with tingling and numbness of fingers and toes for 2 months. no weakness." Id. at 6. Dr. Tsay testified that he (and not his nurse) created this entry.

During cross-examination, Mr. Hohenstein's attorney demonstrated that Dr. Tsay's treatment was incomplete. Dr. Tsay's medical record does not show he reviewed Mr. Hohenstein's neurologic or musculoskeletal system. The record also does not show that Dr. Tsay examined Mr. Hohenstein's neurologic or musculoskeletal system. See id. at 7-8. Dr. Tsay admitted that the lack of documentation meant that he did not perform these steps because if he had done them, he would have documented them.

In response to Mr. Hohenstein's complaints of numbness and tingling, Dr. Tsay ordered various blood tests, including a test to look for a deficiency in vitamin B12. Exhibit 4 at 9. The results were more or less normal. See, e.g., id. at 64.

After the lab results came in, Mr. Hohenstein saw Dr. Tsay's associate, Dr. Molnar. Exhibit 4 at 1. Dr. Molnar's August 11, 2017 record states: "Patient reports several month history of paresthesia of finger tips and feet." Id. Dr. Molnar referred Mr. Hohenstein to a neurologist, Marcia Dover.

Mr. Hohenstein saw Dr. Dover on August 28, 2017. Exhibit 1 at 6-8. Her history begins by noting that Mr. Hohenstein "says 3 months ago he developed some numbness in his feet." Id. at 6. Dr. Dover ordered an EMG and prescribed gabapentin. Id. at 7.

Around the time Mr. Hohenstein started to see Dr. Dover, his job location changed from Blue Angel to L.A. Fitness. Mr. Colon no longer saw Mr. Hohenstein on a daily basis. However, Mr. Olson saw Mr. Hohenstein four or five times per week, usually for at least thirty minutes.

The EMG Dr. Dover ordered took place on September 26, 2017. Exhibit 4 at 121. It showed demyelination. Id.; Exhibit 1 at 4. Mr. Hohenstein also told Dr.

Dover that he was having episodes of losing his balance. Exhibit 1 at 6. Nonetheless, Mr. Hohenstein was still working. See Exhibit 10 at 23.

On October 30, 2017, Dr. Dover wrote Mr. Hohenstein was having "significant" trouble with his balance and was dropping things more frequently. Exhibit 1 at 2. Dr. Dover diagnosed Mr. Hohenstein as having CIDP and the Secretary has not contested this diagnosis. Dr. Dover started IVIG.

After learning from Dr. Dover that Mr. Hohenstein suffered from CIDP, his wife began looking for information about the disease on the Internet. When asked whether she found articles associating the flu vaccine with CIDP, Ms. Hohenstein stated that she did not recall.

Mr. Hohenstein's trouble with balance and holding objects caused Mr. Olson to release Mr. Hohenstein from his job. Mr. Olson was concerned that Mr. Hohenstein's lack of coordination and lack of strength placed Mr. Hohenstein, his coworkers, and machinery at risk. Mr. Olson averred that this conversation about Mr. Hohenstein no longer working as a plumber was "hard" to have with him. Exhibit 11 ¶ 7. Mr. Hohenstein's last day of work was December 9, 2017. Exhibit 10 at 23.

Mr. Hohenstein saw a new neurologist, Justin Kwan, on January 26, 2018. Exhibit 21 at 70. The reasons for the new doctor were Dr. Dover's referral and/or Mr. Hohenstein's wife's push for care at a higher-level facility. When Mr. Hohenstein saw Dr. Kwan, Mr. Hohenstein said he was in good health until "until December 2016/January 2017." Id. at 73. Dr. Kwan confirmed the diagnosis of CIDP and admitted him to Temple University Hospital. Id.

The details of this hospitalization and more recent medical treatments do not inform the question of when Mr. Hohenstein's numbness and tingling began. Thus, although these records were reviewed, they are not summarized.

## Standards for Adjudication

A petitioner is required to establish his case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

4

In reaching decisions, special masters are expected to examine the "record as a whole." 42 U.S.C. § 300aa–13(a)(1). Special masters are directed to consider the medical records, but medical records are not "binding on the special master." 42 U.S.C. § 300aa–13(b)(2); accord Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. 706, 745 n.67 (2009). Congress authorized special masters to find the "onset of . . . an injury . . . occurred within the time period described in the Vaccine Injury Table even though the occurrence of such symptom . . . was not recorded or was incorrectly recorded as having occurred outside such period." 42 U.S.C. § 300aa–13(b)(2).

Medical records that describe the person's condition around the time that the medical records were created are presumptively accurate. See Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, this presumption can be rebutted. Medical records do not always memorialize all the symptoms a patient is experiencing at the time. Petitioners have persuasively explained why they did not complain to a particular medical doctor. See Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382-83 (Fed. Cir. 2021); Tenneson v. Sec'y of Health & Hum. Servs., 142 Fed. Cl. 329, 339 (2019) (special master was not arbitrary in crediting petitioner's testimony "regarding the onset date of her shoulder injury, notwithstanding her delay in seeking treatment"); La Londe v. Sec'y of Health & Hum. Servs., 110 Fed. Cl. 184, 203 n.33 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

In setting forth the findings below, the undersigned also cites to the primary evidence that is the basis for the finding. The undersigned recognizes that not all evidence is entirely consistent with these findings. See Doe 11 v. Sec'y of Health & Hum. Servs., 601 F.3d 1349, 1355 (Fed. Cir. 2010) (ruling that the special master's fact-finding was not arbitrary despite some contrary evidence). Indeed, it is the presence of inconsistent evidence that dictated a proceeding to resolve the factual dispute.

## Analysis

The basic question is how the value of evidence created closer in time to an event compares to the value of evidence created later in time. For the reasons explained below, the undersigned credits the earlier-created evidence.

Dr. Tsay's June 29, 2017 record and Dr. Dover's August 28, 2017 record are relatively consistent.[2] One points to an onset at the end of April 2017, Exhibit 4 at 6, and the other to an onset at the end of May 2017, Exhibit 1 at 6. While Mr. Hohenstein disputed the accuracy of these records, he did not persuasively establish why the records were wrong. On cross-examination, Mr. Hohenstein conceded all the other information was accurate. Mr. Hohenstein has not shown how two doctors, who independently were accurate about many details, could make a similar mistake about onset. Because these records were created close in time to when Mr. Hohenstein was experiencing numbness and tingling and because they corroborate each other, they are persuasive. Based upon these records, it appears that Mr. Hohenstein's numbness and tingling began on approximately May 15, 2017.

In crediting Dr. Tsay's and Dr. Dover's records, the undersigned is declining to give much weight to Dr. Kwan's January 26, 2018 record. Dr. Kwan's record was created about five months after Dr. Dover's record and about seven months after Dr. Tsay's record. Mr. Hohenstein has not shown how his memory improved during this passage of time. Moreover, during this time, Mr. Hohenstein may have learned through his wife's Internet searching that flu vaccines are associated with CIDP.[3]

After Mr. Hohenstein began having balance and coordination problems, he continued working because of his dedication to his job. As Mr. Hohenstein explained, his coworkers helped him and sometimes covered for him. This perspective seems accurate. However, the question is whether Mr. Hohenstein delayed seeking medical treatment for approximately two months or approximately seven months. As explained above, the more likely than not answer is approximately two months.

An onset of numbness and tingling on May 15, 2017 is 193 days after the vaccination. If the parties retained expert witnesses, they are ordered to provide this finding of fact to any experts whom they retain. An opinion not consistent

---

[2] Dr. Molnar's August 11, 2017 record sheds little light regarding the onset of problems because it states Mr. Hohenstein was having problems for "several" months. The term "several" is vague enough that it could be consistent with an onset in the middle of May or the previous December. See Exhibit 4 at 1.

[3] Ms. Thompson's testimony of not recalling whether she saw this material was not credible. See Hines v. Sec'y of Health & Hum. Servs., 21 Cl. Ct. 634, 640 (1990) (recognizing that special masters may evaluate the credibility of a witness appearing by telephone).

with this finding is unlikely to be credited.  <u>Burns v. Sec'y of Health & Hum. Servs.</u>, 3 F.3d 415 (Fed. Cir. 1993).

## **Conclusion**

The evidence preponderates in support of a finding that Mr. Hohenstein's numbness and tingling began on May 15, 2017.

A status conference is set, *sua sponte*, for **November 8, 2022 at 10:00 A.M. Eastern Time**.  The parties should be prepared to discuss any next steps.

Any questions may be directed to my law clerk, Caitlin-Jean Juricic, at (202) 357-6360.

**IT IS SO ORDERED.**

<u>s/ Christian J. Moran</u>
Christian J. Moran
Special Master